28 C.C.P.A. (Patents)

## In re JONES.
### Patent Appeal No. 4482.

Court of Customs and Patent Appeals.
June 30, 1941.

Ross J. Garofalo, of Los Angeles, Cal. (Sol Shappirio, of Washington, D. C., of counsel), for appellant.

W. W. Cochran, of Washington, D. C., for the Commissioner of Patents.

Before GARRETT, Presiding Judge, and BLAND, HATFIELD, LENROOT, and JACKSON, Associate Judges.

JACKSON, Associate Judge.

This is an appeal from a decision of the Board of Appeals of the United States Patent Office affirming that of the Primary Examiner rejecting as unpatentable, in view of the prior art, all of the claims, 27 to 33 inclusive, of an application for a patent for certain alleged new and useful improvements in a method for reclaiming cement-cut drilling mud.

Claims 27 to 31 inclusive are method claims and claims 32 and 33 are product claims.

Claims 27, 28 and 32 are illustrative and read as follows:

"27. A method for treating cement-cut or similarly contaminated muds which comprises adding to said mud an agent selected from the class consisting of bicarbonates of alkali metals and of ammonia, carbon dioxide and mixtures of carbon dioxide and an alkali metal carbonate.

"28. A method for treating cement-cut or similarly contaminated muds which comprises adding to said mud an agent selected from the class consisting of bicarbonates of alkali metals and of ammonia, carbon dioxide and mixtures of carbon dioxide and an alkali metal carbonate in a sufficient amount to reduce the filtration rate of the mud to less than approximately 45 ml. in the first hour of filtration."

"32. The reaction product of a mixture of water, clay and cement with an agent selected from the class consisting of bicarbonates of alkali metals and of ammonia, carbon dioxide and a mixture of carbon dioxide and an alkali metal carbonate in a sufficient amount to produce a mixture having a filtration rate of less than approximately 45 ml. in the first hour of filtration."

The reference relied upon by the examiner and the board is a German publication, "Petroleum," pages 7 and 8, of November 2, 1932.

The alleged invention relates to the art of oil well drilling. Oil wells are drilled by means of a bit attached to the lower end of a drill pipe which is operated by a rotary movement. The drill pipe extends downwardly through a string of pipe called a "casing." An aqueous fluid called "drilling mud" is constantly circulated, during the drilling operation, downwardly through the drill pipe and upwardly through the space between the drill pipe and the casing. The circulation of the mud is intended to cool the rotating bit and to carry off the cuttings produced by the bit. It is necessary that the mud have a viscosity sufficiently high to carry away the cuttings and yet low enough to permit it to be circulated by the pump. When a hole has

been drilled to a certain depth, a length of pipe (casing) is inserted therein and cement is then poured through the pipe. The cement seals off the lower end of the pipe and anchors the pipe to the side of the wall. The cement is permitted to harden and thus supports the lower end of the pipe against the hole wall. Drilling is then resumed through the cement block in the bottom of the hole and the process of cementing and drilling repeated as greater depth is reached and longer and narrower casing is lowered into the hole until the well is ready to be brought into production. After the mud has been circulated for some time, it becomes too viscous to be useful, owing to its having been contaminated with materials such as clay and the cuttings from the cement blocks encountered in drilling. Appellant found that another reason for increased viscosity in the drilling mud was that water therein was lost by infiltration into the earth formations. In oil drilling certain formations are encountered which are greatly weakened by the infiltration of water and which when wet may cave or slough into the hole. This sloughing may result in the seizing of the drill pipes or tools so that they cannot be moved and must be "fished" out. Mud of the quality disclosed by the application, it is said, forms a thin but highly impervious mud layer upon the penetrated formation surfaces and consequently there is a relatively low loss of water by infiltration. In this connection appellant, in his application, states: "The desirable quality of drilling mud has therefore, in this respect, been defined as that property of the mud which allows a minimum loss of water to the formation, while at the same time forming an impervious mud layer or cake of minimum thickness upon the penetrated formation surfaces."

The claimed invention of appellant is described in the statement of the examiner as follows: "The alleged invention is directed to the method of reconditioning or reclaiming a drilling mud which has been cement-cut or similarly contaminated while being used in drilling a well-bore. This is accomplished by treating the contaminated mud with an agent selected from the class consisting of bicarbonates of alkali metals and of ammonia, carbon dioxide and mixtures of carbon dioxide and an alkali metal carbonate. By adding an agent of said class to the mud it is alleged the performance characteristics of the mud, such as the formation of mud cake, ability to pre-vent loss of water by penetration into the formations, yield point, viscosity, sealing properties, etc., are revived or improved."

The reference relates to the same art as the involved application and refers to the drilling mud as "viscous rinsing matter." It points out that the circulating fluid may be contaminated by the presence therein of cement and materials contained in the drilling formations. It also discloses that substances exercising a petogenic (peptic) influence upon the clay constituent of the contaminated mud may be added to reduce the excessive viscosity thereof during drilling. A long list of substances suitable for such purpose is mentioned, among which are "carbonates and bi-carbonates, * * *." Nowhere in the said reference, however, is it cited that the use of the said substances has any effect in lessening the seepage of water from the mud into the penetrated formations.

Both tribunals of the Patent Office held that since claim 27 merely calls for the addition of material such as carbonates and bicarbonates to the contaminated drilling mud, there is nothing patentable in the claim over the disclosure in the reference of the addition of such material to the drilling mud.

The examiner pointed out that claims 28 to 33 inclusive differentiate from claim 27 "only in that they recite the function or result desired to be obtained from the treating agent used." His decision, inter alia, contains the following: "* * * Obviously the patentability of said claims cannot be based on the functional statements over the disclosure in the 'Petroleum' reference. The 'Petroleum' reference clearly discloses that *bicarbonates* used in drilling muds reduce the viscosity of the mud. Applicant also uses *bicarbonates* in the treatment of his mud for the same purpose but, in addition, he states that he has likewise discovered that *bicarbonates* reduce the filtration rate of the mud and, due to said function a better quality mud is produced; which forms a more efficient mud sheath on the walls of the well-bore during the drilling operation. Altho said second function, or result of the bicarbonates, in the treatment of muds, is not disclosed in the 'Petroleum' reference, it is obvious that, if *bicarbonates* reduce the filtration rate of applicant's mud, they also will reduce the filtration rate of the muds mentioned in the 'Petroleum' reference. So, as far as applicant's disclosure is concerned, it differs from that of the 'Petroleum' reference

only in that applicant has discovered a new or additional result in the use of *bicarbonates* as mud treating agents. It is elementary in patent practice that an applicant is not 'entitled to inventive reward for discovering a new result for an old process.' * * *"

The board agreed with the reasoning of the examiner as to claims 28 to 33 inclusive. The board stated in its decision that those claims specify a sufficient amount of the treating agent to produce a desired effect on the filtration rate of the mud, and with respect to the amounts of such agent shown in the reference had the following to say: "Appellant argues that the amount of the agents used by the reference is at most .1% or even less and that it must be remembered that the author of the reference does not profess that all of the named materials or even one of them has ever been tried in actual well drilling operations. It is further argued that the author does not profess that any of the named materials is suitable for improving the filter rate characteristics of any kind of mud. Whether the author has used these materials in drilling muds is of no great importance here since the publication suggests their use for modifying the viscosity of the mud and perhaps for other reasons."

Claim 30 differs from claim 27 only in specifying the addition of sodium bicarbonate to the mud instead of the materials called for by claim 27. While, therefore, both of the decisions below mistakenly included claim 30 with claims 28 to 33 inclusive, nevertheless if the reference properly anticipates claim 27 it is likewise good as a reference against claim 30.

Appellant discloses the use of nothing but carbonates and bicarbonates. The reference discloses the use of the same substances. It is clear that those substances modify the viscosity of the contaminated drilling mud as disclosed in the reference. Appellant has probably discovered that the use of carbonates and bicarbonates also reduces the filtration rate in contaminated drilling mud. In all likelihood the author of the reference had no purpose in his use of those substances except to reduce the viscosity of contaminated drilling mud and possibly the benefit derived from their use on the filtration rate of the mud was not thought of by him. This latter benefit, however, is inherently present in the use of carbonates and bicarbonates as agents for reducing the viscosity of the mud.

■ If the carbonates and bicarbonates reduce the filtration rate in the drilling mud as claimed by appellant, they surely must have the same effect upon the mud of the reference. While the amounts of mixing materials disclosed in the reference are quite small, there appears to be nothing critical in the said amounts. The only difference we can perceive between the disclosure of appellant and that of the reference is that appellant has discovered an additional result in the use of the same added materials with drilling mud. This, of itself, cannot lend patentability to the claims. See In re King et al., 107 F.2d 618, 27 C.C.P.A., Patents, 754; In re Newton et al., 96 F.2d 291, 25 C.C.P.A., Patents, 1106; In re James, 83 F.2d 313, 23 C. C.P.A., Patents, 1124; and In re Burk, 73 F.2d 497, 22 C.C.P.A., Patents, 731.

There is no contention that the article claims should be separately considered, nor do we see any reason why they should be.

■ Appellant contends there are so many materials to be used as viscosity reduction agents set out in the reference that the disclosure amounts to little more than prophetic suggestion and is merely an invitation to carry on research. Appellant has also submitted affidavits showing the results of experiments indicating that some of the materials set out in the reference do not, when added to the mud, benefit the filtration rate of the mud. We agree with the tribunals of the Patent Office that even if a publication contains the disclosure of several materials that do not anticipate those shown in the claimed invention, this, of itself, is not sufficient to vitiate its effect as a reference when it also discloses the same materials as the application.

It is true that the broad term "bi-carbonates" is used in the publication, and there is no mention of the bicarbonates specifically named in the claims. But the contention of appellant, that because of this broad disclosure the reference must fail, does not seem to us to be persuasive for the reason that sodium bi-carbonate is the most commonly known of all the bi-carbonates and therefore the said broad disclosure in the reference is, we think, sufficient.

The decision of the Board of Appeals is affirmed.

Affirmed.